# HAWKER *v.* NEW YORK.

ERROR TO THE COURT OF GENERAL SESSIONS OF THE PEACE FOR THE CITY AND COUNTY OF NEW YORK, STATE OF NEW YORK.

No. 415. Argued March 9, 1898. — Decided April 18, 1898.

The provision in the act of the legislature of New York of May 9, 1893, c. 661, relating to the public health, as amended by the act of April 25, 1895, c. 398, that " any person who, ' . . . after conviction of a felony, shall attempt to practise medicine, or shall so practise, . . . shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than two hundred and fifty dollars, or imprisonment for six months for the first offence, and on conviction of any subsequent offence, by a fine of not more than five hundred dollars, or imprisonment for not less than one year, or by both fine and imprisonment," does not conflict with Article I, section 10, of the Constitution of the United States which provides that " No State shall . . . pass any Bill of Attainder, *ex post facto* Law or law impairing the Obligation of Contracts," when applied to a person who had been convicted of a felony prior to its enactment.

IN 1878 the plaintiff in error, defendant below, was tried and convicted in the Court of Sessions of Kings County, New York, of the crime of abortion, and sentenced to imprison-

ment in the penitentiary for the term of ten years. On May 9, 1893, the legislature of the State of New York passed an act entitled "The Public Health Law," Laws 1893, c. 661, which, as amended by the law of April 25, 1895, c. 398, provides, among other things, as follows:

"SECTION 153. Any person who, . . . after conviction of a felony, shall attempt to practise medicine, or shall so practise, . . . shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than two hundred and fifty dollars, or imprisonment for six months for the first offence, and on conviction of any subsequent offence, by a fine of not more than five hundred dollars, or imprisonment for not less than one year, or by both fine and imprisonment."

Under this statute defendant was indicted in April, 1896, in the Court of General Sessions of the Peace for the city and county of New York. The indictment alleged the conviction in 1878, and charged that, having been so convicted of the crime and felony of abortion, defendant did, on the 22d day of February, 1896, in the city of New York, unlawfully practise medicine " by then and there unlawfully examining, treating and prescribing for one Dora Hoenig." To this indictment he demurred. The demurrer was overruled, and, upon a plea of not guilty, he was tried, convicted and sentenced to pay a fine of $250. That conviction having been sustained by the Court of Appeals of the State, 152 New York, 234, and a remittitur sent down, a final judgment was entered in the Court of General Sessions, whereupon he sued out this writ of error.

*Mr. Hugh O. Pentecost* for plaintiff in error.

*Mr. Robert C. Taylor* and *Mr. Asa Bird Gardiner* for defendant in error. *Mr. W. M. K. Olcott* and *Mr. John D. Lindsay* were on the brief for the defendant in error.

MR. JUSTICE BREWER, after making the above statement, delivered the opinion of the court.

The single question presented is as to the constitutionality

of this statute when applied to one who had been convicted of a felony prior to its enactment. Its unconstitutionality is alleged on the ground of an alleged conflict with article I, section 10, of the Constitution of the United States, which forbids a State to pass " any Bill of Attainder, *ex post facto* Law or law impairing the Obligation of Contracts." The arguments for and against this contention may be thus briefly stated.

On the one hand it is said that defendant was tried, convicted and sentenced for a criminal offence. He suffered the punishment pronounced. The legislature has no power to thereafter add to that punishment. The right to practise medicine is a valuable property right. To deprive a man of it is in the nature of punishment, and after the defendant has once fully atoned for his offence a statute imposing this additional penalty is one simply increasing the punishment for the offence, and is *ex post facto*.

On the other, it is insisted that within the acknowledged reach of the police power, a State may prescribe the qualifications of one engaged in any business so directly affecting the lives and health of the people as the practice of medicine. It may require both qualifications of learning and of good character, and, if it deems that one who has violated the criminal laws of the State is not possessed of sufficient good character, it can deny to such a one the right to practise medicine, and, further, it may make the record of a conviction conclusive evidence of the fact of the violation of the criminal law and of the absence of the requisite good character. In support of this latter argument counsel for the State, besides referring to the legislation of many States prescribing in a general way good character as one of the qualifications of a physician, has made a collection of special provisions as to the effect of a conviction of felony. In the footnote[1] will be found his collection.

---

[1] COLORADO — The board may refuse certificates to persons convicted of conduct of a criminal nature; and may revoke certificates for like cause. Mills Ann. Stat. 1891, c. 101, § 3556.

IOWA — May revoke a certificate to a person who has been convicted of felony committed in the practice of his profession, or in connection

We are of opinion that this argument is the more applicable and must control the answer to this question. No precise limits have been placed upon the police power of a State,

with; or may revoke for like cause; . . . and such refusal or revocation prohibits such person from practising medicine, surgery or obstetrics. Laws 1889, c. 104, § 7.

LOUISIANA — The board is required to strike from the said list (of registered names) the names of persons convicted of any infamous crimes by any court . . . whether prior or posterior to registration. Act June 26, 1882, No. 31, § 5.

NEW JERSEY — May refuse or revoke a license for chronic and permanent inebriety, the practice of criminal abortion, conviction of a crime involving moral turpitude, or for publicly advertising special ability to treat or cure disease which, in the opinion of the board, it is impossible to cure (after hearing). Act May 12, 1890, c. 190, § 5.

NORTH DAKOTA — Substantially the same. Act January 10, 1890, c. 93, § 3.

VERMONT — May revoke or annul a certificate if in their judgment the holder has obtained it fraudulently or has forfeited his right to public confidence by the conviction of a crime. Rev. Laws 1880, c. 172, § 3915.

WASHINGTON — The board will refuse or revoke a license for unprofessional or dishonorable conduct, subject to the right of appeal. . . . "Unprofessional or dishonorable conduct" means procuring or aiding or abetting in a criminal abortion or employing what are popularly known as cappers or steerers; or obtaining any fee on the assurance that any manifestly incurable disease can be permanently cured; or wilfully betraying a professional secret; or advertisements of medical business in which untruthful or improbable statements are made; or advertising any medicine or means whereby the monthly periods of women can be regulated, or the menses reëstablished if suppressed; or the conviction of any offence involving moral turpitude; or habitual intemperance. Act March 28, 1890, §§ 3 and 4.

GREAT BRITAIN AND IRELAND — If any registered medical practitioner shall be convicted in England or Ireland of any felony or misdemeanor, or in Scotland of any crime or offence, or shall be, after due inquiry, judged by the general council to have been guilty of 'infamous conduct in any professional respect, the general council may, if they see fit, direct the register to erase the name of such medical practitioner from the register. Acts 21 and 22 Vict. c. 90, § 29.

NEW BRUNSWICK — Substantially same. Act 1881, c. 19, § 22.

NORTHWEST TERRITORY — Substantially same. Ord. 5, 1888, § 37, as substituted by Ord. 24, 1892, § 1.

NOVA SCOTIA — Substantially same. Rev. Stat. 5th ser. c. 24, § 19.

MANITOBA — Any registered medical practitioner convicted of felony or misdemeanor, before or after the passage of this act or his registration, forfeits his rights to registration, and by direction of the council his name

and yet it is clear that legislation which simply defines the qualifications of one who attempts to practise medicine is a proper exercise of that power. Care for the public health is

---

shall be erased. If a person known to have been convicted of felony or misdemeanor presents himself for registration, the register may refuse registration. If any person registered be judged after due inquiry . . . to have been guilty of infamous or unprofessional conduct in any respect, the council may direct the register to erase his name. Rev. Stat. of Manitoba, 1891, c. 98, § 40.

BRITISH COLUMBIA — Any registered practitioner convicted of any felony thereby forfeits his right to registration, and . . . . his name is required to be erased from the register; or, in case a person known to be convicted of felony presents himself for registration, the register has the power to refuse such registration. Cons. Act, 1888, c. 81, § 32; substantially same as to Quebec; Rev. Stat. 1888, § 3996.

ONTARIO — A practitioner is liable to have his name erased from the register where he has been convicted, before or after registration, of an offence which, if committed in Canada, would be a felony or misdemeanor, or where he has been guilty of any infamous or disgraceful conduct in a professional respect. Rev. Stat. 1887, c. 148, § 34.

NEWFOUNDLAND — The . . . board may try and expel any member of the profession for acts of malpractice, misconduct or immoral habits. . . . Act, 1893, c. 12, § 32.

PRINCE EDWARD'S ISLAND — A medical practitioner guilty of infamous or disgraceful conduct in a professional respect is liable to have his name erased, and, if he apply for registration, the council may refuse it. Act 1892, c. 42, § 22.

NEW ZEALAND — If any registered person shall be or shall have been convicted of any felony or misdemeanor in Great Britain or Ireland, or in any of the British Dominions, the register general and register, respectively, shall erase the name of any such person from the register, and such erasure shall be notified by the register general in the New Zealand Gazette. Medical Practitioners Act, 1869, No. 51.

HAWAII — It shall not be lawful for any person to practise in this kingdom as a physician or surgeon for compensation or reward unless he shall have first presented to the board of health satisfactory evidence of his professional qualifications and good moral character. Act 1876, c. 11, § 3.

ST. LUCIA — If any registered medical practitioner is convicted of any felony, the register shall erase the name of such practitioner from the Medical Register. If any registered medical practitioner is convicted of any misdemeanor, a report shall be submitted . . . to the governor in council, who . . . shall determine whether (he) has been guilty of infamous conduct in any professional or other respect, and may thereupon, if he sees fit, direct the register to erase the name. . . . Medical Practitioner Ordinance No. 77 of 1885, § 11.

something confessedly belonging to the domain of that power. The physician is one whose relations to life and health are of the most intimate character. It is fitting not merely that he should possess a knowledge of diseases and their remedies, but also that he should be one who may safely be trusted to apply those remedies. Character is as important a qualification as knowledge, and if the legislature may properly require a definite course of instruction, or a certain examination as to learning, it may with equal propriety prescribe what evidence of good character shall be furnished. These propositions have been often affirmed. In *Dent* v. *West Virginia*, 129 U. S. 114, 122, it was said in respect to the qualifications of a physician: "The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud."

We note also these further declarations from state courts: In *State* v. *State Medical Examining Board*, 32 Minnesota, 324, 327, it was said: "But the legislature has surely the same power to require, as a condition of the right to practise this profession, that the practitioner shall be possessed of the qualification of honor and good moral character, as it has to require that he shall be learned in the profession. It cannot be doubted that the legislature has authority, in the exercise of its general police power, to make such reasonable requirements as may be calculated to bar from admission to this profession dishonorable men, whose principles or practices are such as to render them unfit to be entrusted with the discharge of its duties." In *Thompson* v. *Hazen*, 25 Maine, 104, 108: "Its authors were careful, that human health and life should not be exposed without some restraint, by being committed to the charge of the unprincipled and vicious. . . . It could not have been intended that persons destitute of the moral qualifications required should have full opportunity to enter professionally the families of the worthy but unsuspecting, be admitted to the secrets which the sick chamber must often entrust to them." In *State* v. *Hathaway*, 115 Missouri,

36, 47 : " The legislature, then, in the interest of society and to prevent the imposition of quacks, adventurers and charlatans upon the ignorant and credulous, has the power to prescribe the qualifications of those whom the State permits to practise medicine. . . . And the objection now made that because this law vests in this board the power to examine not only into the literary and technical acquirements of the applicant, but also into his moral character, it is a grant of judicial power, is without force." In *Eastman* v. *State*, 109 Indiana, 278, 279 : " It is, no one can doubt, of high importance to the community that health, limb and life should not be left to the treatment of ignorant pretenders and charlatans. It is within the power of the legislature to enact such laws as will protect the people from ignorant pretenders, and secure them the services of reputable, skilled and learned men." In *State* v. *Call*, (North Carolina,) 28 S. E. Rep. 517 : " To require this is an exercise of the police power for the protection of the public against incompetents and impostors, and is in no sense the creation of a monopoly or special privileges. The door stands open to all who possess the requisite age and good character, and can stand the examination which is exacted of all applicants alike."

But if a State may require good character as a condition of the practice of medicine, it may rightfully determine what shall be the evidences of that character. We do not mean to say that it has an arbitrary power in the matter, or that it can make a conclusive test of that which has no relation to character, but it may take whatever, according to the experience of mankind, reasonably tends to prove the fact and make it a test. *County Seat of Linn County*, 15 Kansas, 500, 528. Whatever is ordinarily connected with bad character, or indicative of it, may be prescribed by the legislature as conclusive evidence thereof. It is not the province of the courts to say that other tests would be more satisfactory, or that the naming of other qualifications would be more conducive to the desired result. These are questions for the legislature to determine. " The nature and extent of the qualifications required must depend primarily upon the judgment of the State as to their necessity." *Dent* v. *West Virginia, supra*, p. 122.

It is not open to doubt that the commission of crime, the violation of the penal laws of a State, has some relation to the question of character.   It is not, as a rule, the good people who commit crime.   When the legislature declares that whoever has violated the criminal laws of the State shall be deemed lacking in good moral character it is not laying down an arbitrary or fanciful rule — one having no relation to the subject-matter, but is only appealing to a well recognized fact of human experience ; and if it may make a violation of criminal law a test of bad character, what more conclusive evidence of the fact of such violation can there be than a conviction duly had in one of the courts of the State ?   The conviction is, as between the State and the defendant, an adjudication of the fact.   So if the legislature enacts that one who has been convicted of crime shall no longer engage in the practice of medicine, it is simply applying the doctrine of *res judicata* and invoking the conclusive adjudication of the fact that the man has violated the criminal law, and is presumptively, therefore, a man of such bad character as to render it unsafe to trust the lives and health of citizens to his care.

That the form in which this legislation is cast suggests the idea of the imposition of an additional punishment for past offences is not conclusive.   We must look at the substance and not the form, and the statute should be regarded as though it in terms declared that one who had violated the criminal laws of the State should be deemed of such bad character as to be unfit to practise medicine, and that the record of a trial and conviction should be conclusive evidence of such violation.   All that is embraced in these propositions is condensed into the single clause of the statute, and it means that and nothing more.   The State is not seeking to further punish a criminal, but only to protect its citizens from physicians of bad character.   The vital matter is not the conviction, but the violation of law.   The former is merely the prescribed evidence of the latter.   Suppose the statute had contained only a clause declaring that no one should be permitted to act as a physician who had violated the criminal laws of the State, leaving the question of violation to be determined according

to the ordinary rules of evidence, would it not seem strange to hold that that which conclusively established the fact effectually relieved from the consequences of such violation?

It is no answer to say that this test of character is not in all cases absolutely certain, and that sometimes it works harshly.. Doubtless, one who has violated the criminal law may thereafter reform and become in fact possessed of a good moral character. But the legislature has power in cases of this kind to make a rule of universal application, and no inquiry is permissible back of the rule to ascertain whether the fact of which the rule is made the absolute test does or does not exist. . Illustrations of this are abundant. At common law one convicted of crime was incompetent as a witness, and this rule was in no manner affected by the lapse of time since the commission of the offence and could not be set aside by proof of a complete reformation. So in many States a convict is debarred the privileges of an elector, and an act so debarring was held applicable to one convicted before its passage. *Washington* v. *State*, 75 Alabama, 582. In *Foster* v. *Police Commissioners*, 102 California, 483, 492, the question was as to the validity of an ordinance revoking a license to sell liquor on the ground of misconduct prior to the issue of the license, and the ordinance was sustained. In commenting upon the terms of the ordinance the court said: "Though not an *ex post facto* law, it is retrospective in so far as it determines from the past conduct of the party his fitness for the proposed business. Felons are also excluded from obtaining such a license, not as an additional punishment, but because the conviction of a felony is evidence of the unfitness of such persons as a class; nor can we perceive why such evidence should be more conclusive of unfitness were the act done after the passage of the ordinance than if done before." In a certain sense such a rule is arbitrary, but it is within the power of a legislature to prescribe a rule of general application based upon a state of things which is ordinarily evidence of the ultimate fact sought to be established. "It was obviously the province of the state legislature to provide the nature and extent of the legal presumption to be deduced from a given

state of facts, and the creation by law of such presumptions is after all but an illustration of the power to classify." *Jones* v. *Brim*, 165 U. S. 180, 183.

Defendant relies largely on *Cummings* v. *The State of Missouri*, 4 Wall. 277, and *Ex parte Garland*, 4 Wall. 333. In the first of these cases a test oath, containing some thirty distinct affirmations respecting past conduct, extending even to words, desires and sympathies, was prescribed by the State of Missouri upon all pursuing certain professions or avocations; and in the second a similar oath, though not so far reaching in its terms, was required by act of Congress of those who sought to appear as attorneys and counsellors in the courts of the United States. It was held that, as many of the matters provided for in these oaths had no relation to the fitness or qualification of the two parties, the one to follow the profession of a minister of the gospel and the other to act as an attorney and counsellor, the oaths should be considered not legitimate tests of qualification, but in the nature of penalties for past offences. These cases were called to our attention in *Dent* v. *West Virginia, supra,* in which the validity of a statute of West Virginia imposing new qualifications upon one already engaged in the practice of medicine was presented for consideration. After pointing out the distinguishing features of those cases, this court summed up the matter in these words, p. 128:

"There is nothing in these decisions which supports the positions for which the plaintiff in error contends. They only determine that one who is in the enjoyment of a right to preach and teach the Christian religion as a priest of a regular church, and one who has been admitted to practise the profession of the law, cannot be deprived of the right to continue in the exercise of their respective professions by the exaction from them of an oath as to their past conduct, respecting matters which have no connection with such professions. Between this doctrine and that for which the plaintiff in error contends there is no analogy or resemblance. The constitution of Missouri and the act of Congress in question in those cases were designed to deprive parties of their right

to continue in their professions for past acts or past expressions of desires and sympathies, many of which had no bearing upon their fitness to continue in their professions. The law of West Virginia was intended to secure such skill and learning in the profession of medicine that the community might trust with confidence those receiving a license under authority of the State."

*Ex parte Wall,* 107 U. S. 265, is also worthy of notice. In that case the Circuit Court had stricken the petitioner's name from the roll of practising attorneys, on the ground that he had committed a crime, although not in the presence of the court, nor interfering with it in the discharge of its duties. The petitioner here insisted that the act which was charged against him was one for which he was, if guilty, liable to trial and conviction under the law of the State, and that the Federal court had no power on account of such act, one having no connection with his obligations to that court, to disbar him. In reply to this contention it was said, p. 273:

"It is laid down in all the books in which the subject is treated, that a court has power to exercise a summary jurisdiction over its attorneys to compel them to act honestly towards their clients, and to punish them by fine and imprisonment for misconduct and contempts, and, in gross cases of misconduct, to strike their names from the roll. If regularly convicted of a felony, an attorney will be struck off the roll, as of course, whatever the felony may be, because he is rendered infamous. If convicted of a misdemeanor which imports fraud or dishonesty, the same course will be taken. He will also be struck off the roll for gross malpractice or dishonesty in his profession. . . . Where an attorney was convicted of theft, and the crime was condoned by burning in the hand, he was nevertheless struck from the roll. 'The question is,' said Lord Mansfield, ' whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion. . . . It is not by way of punishment; but the court in such cases exercise their discretion, whether a man

whom they have formerly admitted is a proper person to be continued on the roll or not.' "

The thought which runs through these cases, and others of similar import which might be cited, is that such legislation is not to be regarded as a mere imposition of additional penalty, but as prescribing the qualifications for the duties to be discharged and the position to be filled, and naming what is deemed to be and what is in fact appropriate evidence of such qualifications.

In *Gray* v. *Connecticut*, 159 U. S. 74, 77, this court considered the effect of a statute prescribing additional qualifications for one acting as a pharmacist who already had a license from the State therefor, and said : " Whatever provisions were prescribed by the law previous to 1890, in the use of spirituous liquors in the medicinal preparations of pharmacists, they did not prevent the subsequent exaction of further conditions which the lawful authority might deem necessary or useful." See also *Foster* v. *Police Commissioners, supra,* and *State* v. *State Board of Medical Examiners,* 34 Minnesota, 387.

We find no error in the record, and, therefore, the judgment of the state court is

*Affirmed.*

MR. JUSTICE HARLAN, with whom concurred MR. JUSTICE PECKHAM and MR. JUSTICE McKENNA, dissenting.

By an indictment in the Court of Sessions of Kings County, New York, the present plaintiff in error was charged with the crime of abortion, committed September 1, 1877. He was found guilty and sentenced, March 6, 1878, to imprisonment in the penitentiary for the term of ten years.

Chapter 661 of the laws of New York of 1893, as amended by the laws of 1895, provides that " any person who, after conviction of a felony, shall attempt to practise medicine, or shall so practise, shall be guilty of a misdemeanor," etc. :

The present indictment charged the plaintiff in error with the commission of the offence last stated, in that having been convicted in 1878 of the above crime of abortion committed

in 1877, he unlawfully, on the 22d day of February, 1896, in
the city of New York — nearly twenty years after the com-
mission of the crime of abortion — practised medicine by
"then and there unlawfully medically examining, treating
and prescribing for Dora Hoenig."

If the statute in force when the offence of abortion was
committed had provided that, *in addition* to imprisonment in
the penitentiary, the accused, if convicted, should not there-
after practise medicine, no one, I take it, would doubt that
such prohibition was a part of the *punishment* prescribed for
the offence.  And yet it would seem to be the necessary result
of the opinion of the court in the present case, that a statute
passed after the commission of the offence in 1877 and which,
by its own force, made it a crime for the defendant *to continue*
in the practice of medicine, is not an addition to the punish-
ment inflicted upon him in 1878.  I cannot assent to this view.
It is, I think, inconsistent with the provision of the Constitu-
tion of the United States declaring that no State shall pass an
*ex post facto* law.

The scope and meaning of the *ex post facto* clause of the
Constitution was determined in *Calder* v. *Bull*, 3. Dall.. 386,
the opinion being delivered by Mr. Justice Chase.  The classi-
fication there made of cases embraced by that provision has
been universally accepted in the courts of this country,
although this court said in *Kring* v. *Missouri*, 107 U. S. 221,
228, that it was not to be supposed that the opinion in *Calder*
v. *Bull* undertook to define, by way of exclusion, all the cases
to which the constitutional provision would be applicable.
That classification was as follows: "1. Every law that makes
an action done before the passing of the law, and which was
innocent when done, criminal, and punishes such action.
2. Every law that aggravates a crime and makes it greater
than it was when committed.  3. Every law that changes
the punishment and inflicts a greater punishment than the
law annexed to the crime when committed.  4. Every law
that alters the legal rules of evidence and receives less or dif-
ferent testimony than the law required at the commission of
the offence in order to convict the offender."

In *United States* v. *Hall*, 2 Wash. C. C. 366, Mr. Justice Washington said "that an *ex post facto* law is one which, in its operation, makes that criminal which was not so at the time the action was performed, or which *increases the punishment*, or, in short, which in relation to the offence, *or its consequences, alters* the situation of a party *to his disadvantage*." And so it was held in *Kring* v. *Missouri*, 107 U. S. 221, 228, and in *Medley, Petitioner*, 134 U. S. 160, 171.

If, long after the commission of a crime, and long after the offender has suffered all the punishment prescribed at the time for its commission, a statute should, by its own force, and *solely because of his conviction of that offence*, take from him the right to further pursue his profession, would not such a statute inflict upon him a greater punishment than was annexed to the crime when committed, and alter the situation to his disadvantage, "in relation to the offence or its consequences"? In my opinion, this question should receive an affirmative answer.

It was said in argument that the judgment below was sustained by *Dent* v. *West Virginia*, 129 U. S. 114. That case presented no question under the *ex post facto* clause of the Constitution. It only involved the question whether any one could, of right, pursue the practice of medicine without obtaining a license to do so, if the State required a license as a condition of exercising the privilege of pursuing that profession. This court held that such a statute was within the reserved police power of the State, and consistent with the due process of law enjoined by the Fourteenth Amendment. It said: "The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure, or tend to secure, them against the consequences of ignorance and incapacity, as well as of deception and fraud." It was not the case of a state enactment which, by its own force, made it a crime for any person, *lawfully engaged, when such act was passed*, in the practice of the medical profession, to continue to do so, if he had *at any time* in his past life committed a felony, although he may have suffered all the punishment prescribed for such felony when it

was committed. If the statute of West Virginia had been of that character, the same question would have been presented that arises under the statute of New York.

In *Cummings* v. *Missouri*, 4 Wall. 277, 321, this court said: "The theory upon which our political institutions rest is, that all men have certain inalienable rights — that among these are life, liberty and the pursuit of happiness; and that in the pursuit of happiness all avocations, all honors, all positions are alike open to every one, and that in the protection of these rights all are equal before the law. Any deprivation or suspension of any of these rights for past conduct is punishment and can be in no otherwise defined." The court now holds that a legislative enactment does not inflict punishment for past conduct when it makes it a crime for any one lawfully engaged in the practice of medicine — as was the plaintiff in error — to continue in the pursuit of his chosen profession, if at any time in the past, and although a half century may have intervened, he was convicted of a felony of any character, notwithstanding he suffered the entire punishment prescribed for such felony when committed.

In *Ex parte Garland*, 4 Wall. 333, 377, which involved the validity of an act of Congress requiring, among other things, a certain oath to be taken as a condition of the right of one to appear and be heard as an attorney at law by virtue of any previous admission to the bar, this court, referring to certain clauses of the act relating to past conduct, said: "The statute is directed against parties who have offended in any of the particulars embraced by these clauses. And its object is to exclude them from the profession of the law, or at least from its practice in the courts of the United States. As the oath prescribed cannot be taken by these parties, the act, as against them, operates as a legislative decree of perpetual exclusion. And exclusion from any of the professions or any of the ordinary vocations of life for past conduct can be regarded in no other light than as punishment for past conduct. The exaction of the oath is the mode provided for ascertaining the parties upon whom the act is intended to operate, and instead of lessening, increases its objectionable character. All enact-

ments of this kind partake of the nature of bills of pains and penalties, and are subject to the constitutional inhibition against the passage of bills of attainder, under which general designation they are included. In the exclusion which the statute adjudges it imposes a punishment for some of the acts specified which were not punishable at the time they were committed; and for other of the acts *it adds a new punishment* to that before prescribed, and it is thus brought within the further inhibition of the Constitution against the passage of an *ex post facto* law."

The statute in question, it is to be observed, takes no account whatever of the character, at the time of the passage, of the person whose previous conviction of a felony is made an absolute bar to his right to practise medicine. The offender may have become, after conviction, a new man in point of character, and so conducted himself as to win the respect of his fellow-men, and be recognized as one capable, by his skill as a physician, of doing great good. But these considerations have no weight against the legislative decree embodied in a statute which, without hearing, and without any investigation as to the character or capacity of the person involved, takes away from him absolutely a right which was being lawfully exercised when that decree was passed. If the defendant had been pardoned of the offence committed by him in 1877, he would still, under the statute of 1895, have become a criminal if he continued in the practice of his profession.

It will not do to say that the New York statute does nothing more than prescribe the qualifications which, after its passage, must be possessed by those who practise medicine. Upon this point, Mr. Justice Patterson of the Supreme Court of New York well said: "Assuming, for the purpose of the argument, that the legislature may require for the continuance in the practice of medicine that the practitioner shall possess professional knowledge and skill and also good moral character, it is obvious that such requirement must relate to a present status or condition of a person coming within the terms of the act. The law under which this appellant was indicted does not deal with his present moral character. It seizes upon a

past offence, and makes that, and that alone, the substantial ingredient of a new crime, and the conviction of it years ago the conclusive evidence of that new crime. It will be observed that this statute includes any and all felonies — not only those committed in connection with the profession of medicine and surgery, but any and every felony in the whole catalogue of crime, whether committed here or in another jurisdiction. Its design is to deprive convicted felons of the right of practising at all. Clearly it acts directly upon and enhances the punishment of the antecedently committed offence by depriving the person of his property and right and preventing his earning his livelihood in his profession, only because of his past, and in this case expiated, offence against the criminal law. The prisoner has committed no new crime except that which the statute has created out of the old. He had absolutely the right to practise medicine the day before that statute was passed. His former conviction entailed the punishment of imprisonment and disfranchisement as a voter, but it did not take away his property in the right to earn his living on the expiration of his imprisonment, by engaging in the profession of which he was and is a member. His civil rights were not extinguished, but only suspended, during his imprisonment. 2 Rev. Stat. 701, § 19; Penal Code, § 710."

I concur entirely in these views, and must withhold my assent to the opinion of the majority.