ALITO, Circuit Judge,
dissenting:
This case should be reheard by the full court. Rehearing in banc is appropriate when a case “involves a question of exceptional importance,” Fed. R.App. Pr. 35(a), and the constitutionality of the community notification provisions of Megan’s Law indisputably meets this standard. This question is obviously important for those, such as Alexander Artway, who may be subject to these requirements. It is also of enormous importance to children like Megan Kanka, after whom the law was named, and to their parents.
Seven-year-old Megan Kanka disappeared near her home on a summer day in 1994. She was last seen talking to a next-door neighbor, Jesse Timmendequas. The next *596 day Timmendequas was arrested and confessed that he had limed Megan into his home by promising to show her a puppy. According to his confession, he then raped and killed her. Only after Timmendequas’s arrest did Megan’s parents learn that he was a multiple sex offender, that he had assaulted and nearly killed another young girl in 1982, and that the other two men with whom he was sharing the house were also convicted sex offenders whom he had met while incarcerated.
These events and other similar offenses prompted the New Jersey Legislature to enact the community notification provisions that are at issue in this appeal. Similar laws have been enacted by other states, and related legislation has been passed at the federal level. The constitutionality of the New Jersey provisions has been upheld by the New Jersey Supreme Court. Doe v. Poritz, 142 N.J. 1, 662 A.2d 367 (1995). However, the panel’s decision in this ease may well result in the invalidation of these provisions. Following the panel’s decision, the United States District Court for the District of New Jersey enjoined state officials from complying with them. The denial of rehearing in this case means of course that, absent some intervening action by the Supreme Court, the panel’s decision will control subsequent proceedings in the district court and before panels of our court until another occasion for in banc review arises. In the meantime, a law that was enacted by the New Jersey Legislature to deal with what it viewed as a grave and imminent threat will remain in constitutional limbo and may go unenforced. I find this prospect unacceptable.
Whether the community notification provisions of Megan’s Law comport with the Ex Post Facto Clause is not an easy question. The panel opinion’s discussion of this question is thoughtful and scholarly, and its effort to develop a grand unified theory of “punishment” under the Double Jeopardy, Excessive Fines, and Ex Post Facto Clauses is ambitious. I have serious doubts, however, concerning critical portions of the panel’s analysis. I am particularly troubled by the panel’s conclusion that a measure may constitute “punishment” if its “effects” or “negative repercussions — regardless of how they are justified — are great enough.” 81 F.3d at 1261, 1263. I am doubtful that it is possible to determine that a measure constitutes punishment based solely on its effects. Moreover, I am convinced that the panel has misinterpreted California Department of Corrections v. Morales, — U.S. -, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), the precedent on which the panel’s effects test is based.
Is it possible to conclude that a measure constitutes “punishment” based solely on its effects or “sting”? It is certainly not possible to conclude that a governmental action is non-punitive based on its mild effects. (Even a mild criminal sentence — for example, ordering a defendant to pick up litter in the park on a beautiful spring day — is unquestionably punishment.) Is it nevertheless possible to determine that a measure constitutes “punishment” based on its harsh effects? I am skeptical. It is settled that certain governmental actions having severe effects are not “punishment.” For instance, pretrial detention, though sometimes quite harsh, is “regulatory, not penal.” United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). So is the revocation of a professional or occupational license, Hawker v. New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898), or the termination of Social Security benefits, Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960), even though the effects of these actions can be devastating. It is also settled that deportation, “however severe its consequences,” does not implicate the Ex Post Facto Clause. Harisiades v. Shaughnessy, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952) (emphasis added). See also, e.g., INS v. Lopez-Mendoza, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984); Mahler v. Eby, 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549 (1924) (“It is well settled that deportation, while it may be burdensome and severe for the alien, is not punishment.”). In view of these precedents, I have grave doubts whether the panel is correct that a measure may be held to constitute “punishment” under the Ex Post Facto Clause simply because its “negative repercussions — regardless of how they are justi *597 fied — are great enough.” Artway, supra, 81 F.3d at 1263.
Moreover, I am convinced that the panel’s effects test, whatever else may be said in its favor, is not supported by the Supreme Court’s decision in Morales. I see no evidence whatsoever that Morales was meant to adopt the far-reaching proposition that a measure may be held to constitute “punishment” for ex post facto purposes based solely on its effects. Certainly the Court’s opinion does not expressly embrace any such broad proposition, and I think the best reading of the opinion is a much narrower one.
Morales concerned a 1981 California statutory amendment regarding eligibility for parole hearings. Morales had twice been convicted of murder, first in 1971 for killing his girlfriend and then in 1980 for killing and dismembering an elderly woman who had befriended him while he was in prison and who had married him after he was paroled. — U.S. -, 115 S.Ct. at 1599-1600. Under the law in effect at the time of his 1980 conviction, he would have been entitled to a parole hearing every year beginning in 1989. Id. at -, 115 S.Ct. at 1600. The 1981 amendment, however, permitted the Board of Prison Terms to defer hearings for up to three years under certain limited circumstances, viz., if a prisoner had been convicted of more than one offense involving the taking of a life and if the Board found that it was not reasonable to expect that parole would be granted during the intervening years. Id. In denying Morales parole in 1989, the Board found that he satisfied these criteria and thus deferred his next hearing for three years. Id.
Morales argued that the application to him of the 1981 amendment violated the Ex Post Facto Clause, and he “relie[d] chiefly on a trilogy of cases holding that a legislature may not stiffen the ‘standard of punishment’ applicable to crimes that have already been committed. See Lindsey v. Washington, 301 U.S. 397 [401, 57 S.Ct. 797, 799, 81 L.Ed. 1182] (1937); Miller v. Florida, 482 U.S. 423 [107 S.Ct. 2446, 96 L.Ed.2d 351] (1987); Weaver, v. Graham, 450 U.S. 24 [101 S.Ct. 960, 67 L.Ed.2d 17] (1981).” Morales, — U.S. at -, 115 S.Ct. at 1601. The Supreme Court, however, distinguished these cases on the ground that they involved laws that “had the purpose and effect of enhancing the range of available prison terms,” whereas the amendment at issue in Morales “simply ‘alter[ed] the method to be followed in fixing a parole release date under identical substantive standards.’” Id. at -, 115 S.Ct. at 1602 (citations omitted).[2]
The Court then rejected Morales’ argument that “the Ex Post Facto Clause forbids any legislative change that has any conceivable risk of affecting a prisoner’s punishment.” — U.S. at -, 115 S.Ct. at 1602. The Court noted that this argument would require invalidation of “any of a number of minor (and perhaps inevitable) mechanical changes that might produce some remote risk of impact on a prisoner’s expected term of confinement,” “including such innocuous adjustments as changes to the membership of the Board of Prison Terms, restrictions on the hours that prisoners may use the prison law library, reductions to the duration of the parole hearing, restrictions on the time allotted for a convicted defendant’s right of allo-cution before a sentencing judge, and page limitations on a defendant’s objections to pre-sentence reports or on documents seeking a pardon from the governor.” Id. at-, 115 S.Ct. at 1603. It was in this context that the Court wrote that “the question of what legislative adjustments “will be held to be of sufficient moment to transgress the constitutional prohibition’ must be a matter of ‘degree.’” Id. (emphasis in original) (quoting Beazell v. Ohio, 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925)). The Court then concluded that the 1981 California amendment created “only the most speculative and attenuated *598 possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes” and that “such conjectural effects” were “insufficient” to establish an ex post facto violation. Id.
I do not interpret Morales as standing for the sweeping proposition that any measure may be held to constitute “punishment” under the Ex Post Facto Clause based solely on its effects. Rather, I think that Morales is a narrow decision that means only that when a measure does not retrospectively “change the sentencing range” applicable to a particular offense (— U.S. at -, 115 S.Ct. at 1602) but does make procedural or other changes that may indirectly affect the length of time that a prisoner may serve, no violation of the Ex Post Facto Clause will be found if the possibility of such an indirect effect is “speculative and conjectural.” — U.S. at -, 115 S.Ct. at 1603. Morales does stand for the proposition that the “effects” of a challenged measure are significant within this narrow context, but I do not think that it is correct to read Morales as adopting a universally applicable effects test. It is telling, I think, that Morales was not even cited in the excellent briefs filed on behalf of Artway and his supporting amicus, the American Civil Liberties Union of New Jersey.
The panel’s effects test is especially troubling because it encompasses not only the direct effects of the community notification provisions but also what may be called their secondary effects, that is, the effects on released sex offenders of actions taken by private citizens who are in turn affected by community notification. I doubt whether any reasonably accurate assessment of the likely secondary effects of community notification will be possible unless implementation of these provisions is permitted in New Jersey or elsewhere in a sufficiently large sample of cases over a sufficiently extended period of time. As the panel itself seems to recognize, however, the constitutionality of these provisions is likely to be settled by the first batch of pre-enforcement challenges. See 81 F.3d at 1250 n. 9. At that point, it is doubtful that there will be an adequate empirical basis for determining what the probable long term effects of community notification will be. What we are likely to see, I fear, are district court “findings” based on bits of evidence that really prove little about the likely effects over the long term of a program of community notification. This is a most unedifying prospect.
For these reasons, I disagree with the court’s refusal to rehear this case in bane.
Judge GREENBERG and Judge NYGAARD join in this opinion.

. The Court expressly disavowed Lindsey, Weaver, and Miller to the extent those decisions “suggested that enhancements to the measure of criminal punishment fall within the ex post facto prohibition because they operate to the ‘disadvantage’ of covered offenders.” Id. at - n. 3, 115 S.Ct. at 1602 n. 3 (citations omitted). And the opinion stressed that "the focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of ‘disadvantage,’ ... but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.” Id.