No. **A-CV-54-90**
# Supreme Court of the Navajo Nation

---

**Peter MacDonald Sr., Appellant,**

**v.**

**Paul Redhouse, Chairman of the**
**Navajo Board of Election Supervisors, and the**
**Navajo Board of Election Supervisors, Appellees.**
**Decided February 18, 1991**

---

## OPINION

Before TSO, Chief Justice, BLUEHOUSE and AUSTIN, Associate Justices.

Carol K. Retasket, Esq., Window Rock, Navajo Nation (Arizona), for the Appellant; and Claudeen Bates Arthur, Esq., Legislative Counsel, The Navajo Nation, Window Rock, Navajo Nation (Arizona), for the Appellees.

Opinion delivered by Bluehouse, Associate Justice.

This is an appeal from a decision of the Navajo Board of Election Supervisors, dismissing a statement of grievance filed by Peter MacDonald Sr. following a prior decision of that body revoking his certification as a 1990 general election candidate for the presidency of the Navajo Nation. The appeal is brought pursuant to 11 N.T.C. § 321.B.4 (1990). This Court has jurisdiction to review the matter.

## I. FACTS

Peter MacDonald Sr. ("MacDonald") qualified as a candidate for the office of President of the Navajo Nation, and was successful in the 1990 primary election for the office. On October 22, 1990, MacDonald was convicted of numerous violations of Navajo Nation criminal statutes, including bribery, "kickbacks," and breaches of the Navajo Nation Ethics in Government Law of 1984.

On October 24, 1990, the Navajo Board of Election Supervisors ("Board") adopted its Resolution No. BOESO-028-90, "Revoking the Certification of Mr. Peter MacDonald Sr. as a Presidential Candidate for the Navajo Nation General Election." The resolution further afforded MacDonald the opportunity to file a statement of grievance to dispute the Board's decision. He took advantage of that opportunity by filing a statement of grievance with the Board on October 26, 1990. The handwritten statement was accompanied by several documents, which were incorporated into the statement of grievance.

On November 1, 1990, the Board dismissed the statement of grievance and

advised MacDonald of his right to appeal. This appeal followed.

MacDonald makes nine assignments of error in his appeal, and those with legal relevance may be summarized as follows:

1. Whether legislation revising the powers and authority of the Board, providing for the disqualification of candidates for public office upon their convictions for certain crimes, and generally regulating the conduct of elections, constitute bills of attainder and are therefore invalid?

2. Whether such legislation is ex post facto in nature and therefore invalid?

3. Whether the Board had the power, independent of the sanctions procedure in the Navajo Nation Ethics in Government Law, to decertify and disqualify MacDonald as a candidate?

4. Whether MacDonald sustained his burden of showing noncompliance by the Board with the Navajo Election Code of 1990?

## II. BILL OF ATTAINDER AND EX POST FACTO LAWS

MacDonald's claims that election statutes which disqualify from candidacy individuals convicted of crimes of corruption in public office constitute bills of attainder border on the frivolous, if they are not in fact frivolous. MacDonald previously raised the issue of what comprises a bill of attainder in litigation challenging a Navajo Tribal Council resolution placing him on administrative leave. In the decision, *In re Certified Question II*, we held that such legislative action does not constitute a bill of attainder. 6 Nav. R. 105 (1989). The issue of whether there was a bill of attainder against MacDonald also was answered in the negative by the trial court in *Navajo Nation v. MacDonald*, No. WR-CV-99-89 (Window Rock Dist. Ct., 1989).

A "bill of attainder" is the act of a legislature which determines a person's guilt and imposes punishment without the protections provided by a court of law under criminal statutes and fair court procedures. The most recent United States Supreme Court decision dealing with the issue, *Nixon v. Administrator of General Services*, defined it as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." 433 U.S. 425, 468 (1977). The United States Constitution prohibits such acts by the United States Congress and the state legislatures, as does our Navajo Nation Bill of Rights. 1 N.T.C. § 3 (1986).

The essential elements of a bill of attainder are the targeting by the legislature of an individual or easily identifiable members of a class, and the punishment of that person or those persons in some manner. *Nixon*, 433 U.S. at 469. It should be noted that, lacking some evidence that a person was "targeted" by a legislature, the definition of "punishment" remains irrelevant. However, assuming *arquendo* that evidence here can be construed to give credence to the claim of targeting, the issue then becomes one of whether the appellant was "punished"

by the legislative action of the Navajo Nation Government.

MacDonald cites the case of *Cummings v. Missouri*, 71 U.S. 277, 320 (1867), for the proposition that denying an individual the ability to hold public office can be "punishment" within the meaning of the second element of a bill of attainder. That is correct — if the legislation is not a justifiable regulation of conduct. *Nixon*, 433 U.S. at 475-76. There are three tests to determine whether a legislature has enacted a prohibited bill of attainder: An historic test, which looks to past examples of prohibited legislative actions; functional test, which examines such acts to see if they in fact impose punishment upon an identifiable individual or class of persons; and, motivational test, which studies the background of a legislative act to see if the legislature intended to punish a person or class. *Nixon*, 433 U.S. at 473-75, 475-78, 478-84.

None of these tests, applied here, shows that recent legislative changes in Navajo Nation election laws constitute punishment of MacDonald. The legislative enactments of which appellant complains are nothing more than an attempt to modernize and streamline Navajo Nation election law, making certain that individuals who judicially are found guilty of corruption in office cannot run for public office. They are not the kinds of penalties (imprisonment, banishment, confiscation of property, or disqualification from employment or profession for "disloyalty") which traditionally constitute bills of attainder. *Id.* at 474.

While MacDonald cites *Cummings v. Missouri* to support his claims, that case involved a loyalty oath which was used to bar sympathizers with the Rebel (i.e. Southern) cause during the Civil War of the United States from public office and the professions. 71 U.S. at 316-17. There is no loyalty oath involved here, and the record does not show that the Navajo Tribal Council or the present Navajo Nation Council ("Council") was engaged in legislative punishment of MacDonald without the safeguards of a fair trial.

The functional test for "punishment" also is not met. The test relies on the assumption that where there is apparent "targeting" and where "legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decision makers." *Nixon*, 433 U.S. at 476. Conflict of interest laws, although they happen to disadvantage or restrict classes of persons, have been held permissible as based on legitimate legislative purposes. *See, United States v. Brown*, 381 U.S. 437 (1965). Likewise, restrictions based upon a criminal conviction have been upheld. A legislature legitimately may adopt a law that a criminal conviction, adjudged by a court, disqualifies a person from certain offices or positions. *See, De Veau v. Braisted*, 363 U.S. 144 (1960). Thus, under the functional test analysis, there was no "punishment" of MacDonald when the Council made decisions (in both the "Title 2 Amendments" of 1989 and the Navajo Election Code of 1990) to take positive action to prevent corruption in office, using election law and an election watchdog, in the form of the Board.

In *Nixon*, the United States Supreme Court observed that, "We, of course, are

not blind to [Nixon's] plea that we recognize the social and political realities of 1974. It was a period of political turbulence unprecedented in our history." 433 U.S. at 483-84. Likewise, this Court is not blind to the political turbulence within the Navajo Nation that has occurred from 1989 through the present. This leads us to the "motivational test," asking whether the legislation attacked by MacDonald was, in its motivation and intent, legislation intended to punish MacDonald.

The Navajo Nation Council may have had MacDonald in mind when it enacted the Title 2 Amendments, revisions of the election code, and other legislation designed to deal with corruption in public office. However, the question is not whether the Council used the events surrounding MacDonald as the moving force or incentive for such legislation, but whether the legislation was designed to punish MacDonald without a legitimate public purpose or intent to exercise governmental power for the good of the Navajo Nation. The Navajo Election Code has long had provisions which bar convicted felons from holding public office. The tightening and refinement of the Navajo Election Code of 1990 simply focused the law upon the kinds of corruption which came to the attention of the Council, the Navajos, the American public, and even the world community through international news. The legislative reforms do not mention MacDonald by name, and they are not aimed at him alone. They are election reforms which affect all who run for public office. We take judicial notice of other election appeals presently pending before the Court which involve disqualifications for convictions, and conclude that the election reforms are achieving the intended legislative purpose of bringing legitimate personal qualifications for public office to the attention of an official body. Therefore, there was no "punishment" and thus, there was no bill of attainder in violation of 1 N.T.C. § 3, in the disqualification of MacDonald as a candidate.

The prohibition against bills of attainder and that against ex post facto laws are closely linked because both involve the "denunciation and condemnation of an individual" by a legislature, "often act[ing] to impose retroactive punishment." *Nixon*, 433 U.S. at 468, n.30 (citation omitted). The United States Supreme Court has said that, "our cases have not attempted to precisely delimit the scope of this Latin phrase, but have instead given it substance by an accretion of case law." *Dobbert v. Florida*, 432 U.S. 282, 292 (1977). The general principle is that where a legislature makes a law which punishes as a crime an act which was committed before the law was passed, and which was innocent or not criminal when it was done; which increases punishments and penalties after the crime was committed; or which deprives a criminal defendant of a defense available in the law when the act was committed, there is an ex post facto law. *Id.* Such laws are prohibited by the Navajo Nation Bill of Rights at 1 N.T.C. § 3 (1986).

The ex post facto prohibition generally relates to changes in criminal law, although there are some cases which have prohibited new legislative penalties which punish past conduct. As it is with the bill of attainder doctrine, where there

is a valid legislative purpose which generally prohibits future conduct, the law is valid. *See De Veau v. Braisted*, 363 U.S. 144; *Flemming v. Nestor*, 363 U.S. 603 (1960); *Hawker v. New York*, 170 U.S. 189 (1898).

The new election changes were not specifically enacted to punish MacDonald or to increase any penalty against him for convictions of criminal offenses. They were passed to exercise the "power to pass laws for regulating and superintending ... elections, and ... secur[e] for the purity thereof, and the rights of citizens to vote there at peaceably and without molestation." *Ex Parte Siebold*, 100 U.S. 371, 382 (1879). That case, dealing with legislation enacted in 1870 to deal with election corruption, validated the power to enact election reforms, "[i]n light of recent history, and of the violence, fraud, corruption, and irregularity which have frequently prevailed at such elections...." *Id.*

The election reforms of 1989 and 1990 are not ex post facto laws, made to punish MacDonald, but laws which are well within the competence of the Council and are designed to promote the integrity of public office.

## III. INDEPENDENT BOARD POWER TO DISQUALIFY MacDONALD

MacDonald argues, very briefly, that since the Council did not apply the sanctions procedures provided by the Navajo Nation Ethics in Government Law (at 2 N.T.C. § 3756), the Board was without power to disqualify him. This argument fails as a matter of statutory construction.

While the cited section does provide a means for the Council to find that there have been violations of the Navajo Nation Ethics in Government Law, enacted in 1984, 2 N.T.C. § 3757(c) (4) (a separate provision from that cited by MacDonald) provides:

> A person convicted of a misdemeanor under this chapter [the ethics law] shall not be a candidate for elective public office, nor be eligible for any appointive office of the Navajo Nation, nor any of its governmental entities or political governing bodies, for four (4) years following the date of conviction.

That subsection is an independent statement of automatic sanctions and penalties flowing from a criminal conviction for an ethics violation. It is not dependent upon any determination by the Council following notice and a hearing.

The 1990 revision of the Navajo Election Code specifically provided that a qualification for the office of President or Vice President of the Navajo Nation is that the candidate:

> Must not have been convicted of any misdemeanor involving crimes of deceit, untruthfulness and dishonesty, including but not limited to extortion, embezzlement, bribery, perjury, forgery, fraud, misrepresentation, false pretense, theft, conversion, or misuse of Tribal funds and property, and crimes involving the welfare of children, child abuse, child neglect, aggravated assault and

aggravated battery within the last five (5) years. Must not have been found in violation of the Navajo Ethics in government [sic] or Election Laws.

11 N.T.C. § 8.A.7 (1990).

This limitation is independent of any sanctions power which the Council may have. The United States Supreme Court decision in *Ex Parte Siebold*, 100 U.S. 371, upheld the necessary power of Congress to make changes in election law at any time. The Navajo Nation Council chose to make changes in the qualifications of candidates for public office in 1990, and the provisions of the section used to decertify and disqualify MacDonald serve a legitimate Council purpose. That purpose is to assure public confidence in the integrity of the Navajo Nation Government. Thus, the Council "may decide that persons convicted of certain crimes manifesting moral turpitude are disqualified from holding public office." 63A Am. Jur. 2d *Public Officers and Employees* § 48 (1984). Our statutes provide that the disqualification arises upon "conviction" of one of the listed crimes, and MacDonald's conviction in the Window Rock District Court was sufficient cause for the Board's action. *See, Id.* at § 49.

## IV. SUFFICIENCY OF OTHER CHALLENGES

Candidacy qualification decisions may be factual, such as whether a proposed candidate affirmatively satisfies a requirement or falls within its exclusion, or they may be legal. MacDonald's statement of grievance raises questions of law by way of challenges to the validity of the Council and to the impartiality of the Board. Neither challenge is supported by the law.

First, MacDonald argues that "the authority of the Council is limited to expending tribal funds and to draft a tribal constitution. It has no other authority to subvert the will of the Navajo Electorate until after it has given the Navajo voting public an opportunity to vote on a tribal constitution...." Appellant's Brief at 7. MacDonald relies upon 25 U.S.C. § 636, a 1950 federal statute authorizing the members of the Navajo Tribe to adopt a tribal constitution formulated by the Navajo Tribal Council. This is an utterly amazing contention for MacDonald to forward because, as chairman of the Navajo Tribal Council for several terms, his own accomplishments would be void if the contention was correct. MacDonald joins non-Indian litigants who have unsuccessfully questioned the legitimacy of the Navajo Nation Government.

We put this argument to rest in our decision, *In re Certified Questions II*, 6 Nav. R. 105, where we reviewed the history of the Navajo Nation Government from Fort Sumner to the present and held that the Council is the legitimate governing body of the Navajo Nation.

Second, MacDonald goes outside the record before the Court to assert that the Board decision decertifying and disqualifying him was void because Stanley Milford, allegedly an employee of another 1990 candidate for the office of Navajo Nation President, voted as a Board member. This challenge ignores both

the fact that the Board's October 24, 1990 decision was unanimous, so the decision would have been the same with or without Milford's vote, and the fact that as a matter of law MacDonald was not eligible to be a candidate by virtue of his criminal convictions.

MacDonald's remaining challenges are beyond the jurisdiction of both the Board and this Court. He broadly asserts that the Board's action subverts the will of 10,000 Navajo voters and denies them the right to petition the Navajo Nation Government for a redress of grievances. Legislatures carry out the popular will of the people. A fundamental function of a legislature — defining how it will be chosen and composed and how government will function — is carried out by fixing the requirements for public office.

Here, the legislatures which enacted the 1984 ethics code and the 1990 election code revisions were elected by the majority of the Navajo voters and, absent any evidence to the contrary, it must be assumed that the electorate's will was followed and obeyed. Therefore, the Board, when it became aware of MacDonald's convictions, was mandated to apply the disqualficiations statutes, 11 N.T.C. § 8.A.(7) and 2 N.T.C. § 3757(c)(4), which had been duly written into the law by the legally elected representatives of the Navajo people.

As for the right to petition the Navajo Nation Government for a redress of grievances, that right was not impaired by the Board's decision. That right was exercised at the ballot box in November, 1990.

Throughout the recent period of turmoil, the process of law and orderly government has faced severe challenges. The Navajo Nation Supreme Court is required by law to hear appeals and render final judgments on the basis of law, equity, and tradition. Judicial Reform Act of 1985, Navajo Tribal Council Resolution No. CD-94-85 (December 4, 1985). Applying all three sources of law, and considering this appeal from the standpoint of both Navajo laws and traditions and Anglo legal principles, the only possible ruling is that the Board acted within, and at the mandate of, the valid laws of the Navajo Nation, duly and properly enacted by the Council. Therefore, the October 24, 1990 and November 1, 1990 decisions of the Board are affirmed.